```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          12 Cr. 163 (DAB)

 5

 6   JOHN KINNUCAN,

 7                                          Hearing on Violation
                   Defendant.

 8   ------------------------------x

 9                                          New York, N.Y.
                                            April 25, 2018
10                                          2:48 p.m.

11

12   Before:

13                    HON. DEBORAH A. BATTS,

14                                          District Judge

15                           APPEARANCES

16   GEOFFREY S. BERMAN
          Interim United States Attorney for the
17        Southern District of New York
     LARA POMERANTZ
18        Assistant United States Attorney

19   DAVID E. PATTON
          Federal Defenders of New York, Inc.
20        Attorney for the Defendant
     JENNIFER BROWN

21   ALSO PRESENT:   BRITTANY LARSON, Social Worker

22

23

24

25
```

1              (Case called)

2              MS. POMERANTZ:  Good afternoon.  Lara Pomerantz, for

3    the government.  With me at counsel table is Probation Officer

4    Shawnte Lorick.

5              THE COURT:  Good afternoon to both of you.

6              On behalf of Mr. Kinnucan, we have Ms. Jennifer Brown.

7              MS. BROWN:  Good afternoon.

8              THE COURT:  Good afternoon.

9              And also Ms. Brittany Larson.

10             MS. LARSON:  Good afternoon.

11             THE COURT:  Good afternoon.

12             Mr. Kinnucan, good afternoon.

13             THE DEFENDANT:  Good afternoon.

14             THE COURT:  Ms. Pomerantz, would you fill me in on

15   where we are in terms of Mr. Kinnucan's arrival back in New

16   York.

17             MS. POMERANTZ:  Your Honor, my understanding is that

18   the defendant arrived today via an air lift.  He was in another

19   district.  He was presented in or appeared before the court in

20   the Middle District of Alabama, and that was on or about

21   March 30.

22             THE COURT:  Thank you.

23             Ms. Brown, have you had any opportunity to talk with

24   Mr. Kinnucan?

25             MS. BROWN:  I have.

 1          THE COURT:  Just sit.

 2          MS. BROWN:  OK.  Not used to that, your Honor.

 3          I've had an opportunity to speak briefly with

 4   Mr. Kinnucan and also with the government and probation.  Just

 5   to give a general overview, last time when we were here, we had

 6   good intentions in sending Mr. Kinnucan down to Alabama.  His

 7   brother was there.  A lot of effort went in, and he made it

 8   through the time in the halfway house, which was six months,

 9   and then things fell apart as soon as he left, your Honor.

10   It's been about almost 18 months by my count since he left.  It

11   was September of 2016.

12          About a month ago now, Mr. Kinnucan just got tired and

13   called the probation/marshals and surrendered himself.  During

14   that time period, he did not commit new crimes, but he also

15   lost touch with his family.

16          You can, just by looking at him, see that he's not

17   looking well, your Honor.  He's about as thin as I've ever seen

18   him, and that's after being in custody for a month.  I think he

19   remains severely depressed, so he's not in a great place,

20   similar, if not worse, to where we were the last time we were

21   together.

22          THE COURT:  I'm sorry.  Say that again.

23          MS. BROWN:  Similar, if not worse, his condition to

24   when we were together last.

25          THE COURT:  Some of which, I guess, he may have to

1    take responsibility for.

2          MS. BROWN:  Of course, your Honor.  Living on the

3    street is hard living, and depression is a stubborn thing, and

4    it seems to impact his ability to function.

5          I will say he has not committed any new crimes, your

6    Honor, so that's a good thing.

7          THE COURT:  What you're saying is that you're not

8    aware of him committing any new crimes.  He has not been

9    arrested under his name.  Whether he's been arrested under

10   another name is not clear.  Eighteen months is a long time.

11         MS. BROWN:  It is, your Honor.  I'm assuming that the

12   probation department would have access to fingerprint matches

13   if he had been.  I think we have to accept as fact that he

14   hasn't committed any new crimes because there's no indication

15   that he has.  So I don't think it's fair to assume otherwise.

16         THE COURT:  I'm not assuming.  I'm asking.

17         Ms. Larson, what do you have to say on behalf of

18   Mr. Kinnucan?  Have you had a chance to talk with him?

19         MS. LARSON:  No, no, your Honor.

20         THE COURT:  Then I withdraw my questions.

21         MS. LARSON:  OK.

22         THE COURT:  Ms. Lorick, what's going on here?

23         MS. LORICK:  Good afternoon.

24         THE COURT:  Good afternoon.

25         MS. LORICK:  So everyone here, I have probably the

1    least experience with Mr. Kinnucan, but I did have an

2    opportunity to speak to the officer in Alabama who did

3    supervise him briefly.  And what he indicated to me was that

4    the plan that was put in place the last time that Mr. Kinnucan

5    was before your Honor did work for a short time.  Mr. Kinnucan

6    did go to live with his brother and his family in Alabama.  But

7    that plan shortly fell apart as Mr. Kinnucan's mental health

8    appeared to be in decline, and he was not maintaining his

9    hygiene and, according to what the brother reported to the

10   officer, began to overindulge in alcohol.  And so he was asked

11   to leave the brother's residence, which led to his placement at

12   the halfway house.

13           At the halfway house, he did have some progress in

14   that he did go to mental health treatment, but my understanding

15   is that his level of engagement was not what we would want it

16   to be.  He did not speak with the clinician.  He did not talk.

17   He did go.  He showed up.

18           (Continued on next page)

19

20

21

22

23

24

25

6

1          MS. LORICK:  He completed the halfway house placement

2    and, as the Court is aware, once he was done with the halfway

3    house, his communication with the probation department ended as

4    well.

5          The probation officer did report, as the Court is

6    already aware, that Mr. Kinnucan reached out to him just

7    randomly a couple of weeks ago, and the arrangements were made

8    for him to be taken into custody and that's what brings us here

9    today.

10          As it relates to what's next, I think it's clear to

11    everyone here that Mr. Kinnucan's mental instability is what is

12    probably preventing him from complying with the terms of

13    probation and the graciousness of the Court's extension of

14    trust in him.  I think that's one thing that has to be

15    addressed is his mental health.

16          THE COURT:  What about the alcoholism?

17          MS. LORICK:  We don't have anything from the halfway

18    house to suggest that there was an alcohol abuse problem.

19    That's what his brother reported to the probation officers.

20          THE COURT:  When he was before me earlier, alcohol was

21    also one of the issues.  And to hear that his brother was not

22    able to put up with Mr. Kinnucan again because of alcohol

23    suggests to me that alcohol still is an issue.

24          MS. LORICK:  Yes.  That would be very true, your

25    Honor.  A comprehensive plan that would include substance

1    abuse, alcohol addiction treatment, and mental health treatment

2    would in Mr. Kinnucan's best interests.  But I think the

3    concern of the probation department, and I believe it would be

4    a concern of yours, too, is how do we compel or encourage

5    Mr. Kinnucan to engage.

6              THE COURT:  Yes.  I think that was very well put,

7    Ms. Lorick and I appreciate that.

8              It's not clear to me what would work because assuming

9    he went into a program that dealt with his mental health and

10   his alcohol problem, and he continued in it and it was -- I

11   assume it would have to be residential.  Once he completed

12   that, it seems that he has not been able to maintain anything

13   that he has gained from being in these programs.

14             The question becomes, to me at least, is it

15   appropriate on his record of noncompliance to even consider

16   putting him into some sort of program like that?

17             Of course I know that Ms. Brown is going to want to

18   talk to me about that.

19             MS. BROWN:  Your Honor, what the parties were thinking

20   about is another halfway house, but this time in New York with

21   the idea being that because the demonstrated success was in the

22   halfway house and because he has no support system in Alabama

23   anymore that a period of time of relative stability in New York

24   to try to reengage -- he has got to find housing and a job and

25   mental health, all of these things where he's starting from

1   zero.  So that as opposed to incarcerating him and then sending

2   him out with nothing in between.  The halfway house would

3   provide him some opportunity to at least transition him,

4   reintegrate him is the word I think Ms. Lorick was using.

5   That's one thing that all the parties -- it's my understanding

6   that he could engage with treatment while at the halfway house.

7            THE COURT:  Are you giving me a term of art, engage in

8   treatment?  What do you mean?

9            MS. BROWN:  Participate.  That he could go to

10  appointments, he could meet with mental health providers, that

11  he wouldn't stay in the halfway house and get the treatment

12  there.  He would make appointments and go outpatient, your

13  Honor, and that he was able to make the appointments and do

14  that when he was in Alabama.

15           I think that the mental health problems are

16  longstanding, they have been going on for a while, and we are

17  doing the best we can to address them, your Honor.  But I don't

18  think there is a panacea.  And the reason that all parties

19  thought this would be a good idea is because on the record

20  before you the one period of stability that we had was the six

21  months that he did in the halfway house in Alabama.

22           THE COURT:  Was that residential?

23           MS. BROWN:  It's residential in the sense that he's

24  compelled to stay in the halfway house and that his treatment

25  is provided by outside providers while he's in the halfway

 1    house.  He lives there, if that's what you mean by residential.

 2    It's not a therapeutic setting.  It's a correctional setting.

 3              THE COURT:  Who made the appointments?

 4              MS. BROWN:  I think Officer Lorick is better able to

 5    speak how that would work.

 6              MS. LORICK:  The probation department made the

 7    referral and it was staff at the halfway house that would

 8    transport him to and from the appointments.

 9              THE COURT:  Who actually made the appointment?

10              MS. LORICK:  I can confirm, but it was probably the

11    probation officer who made the appointments.

12              THE COURT:  I'm trying to glean from this something

13    that Mr. Kinnucan did on his own that suggests that he is

14    interested in getting help.

15              MS. BROWN:  He did surrender himself, your Honor.

16    That's an indication that he realized that he couldn't do what

17    he was doing anymore.

18              THE COURT:  But that's a little different, Ms. Brown,

19    from what I just said.  It's good that he realized he couldn't

20    do what he was doing anymore, but it isn't clear to me that

21    that shows that he's interested in taking advantage of any of

22    the programs that would help him with his alcoholism and his

23    depression.

24              MS. BROWN:  I think one of the problems of depression,

25    your Honor, is inability to act to help yourself.  That is sort

1    of a core benchmark of what depression is.  The disease itself

2    can be an obstacle to getting the help he needs.  I think

3    that's what's been going on with him.  He goes to the

4    appointment.  But if you are really depressed and don't think

5    you are worthy, all of the things that go on with being

6    severely depressed make it difficult to act in his own best

7    interests.

8              THE COURT:  Ms. Pomerantz.

9              MS. POMERANTZ:  Your Honor, the government has spoken

10   with Officer Lorick and the concerns about the defendant's

11   failure to report to probation once he left the halfway house

12   are real and the fact that he was out for such a significant

13   period of time are real.

14             But the question before the Court is the best way

15   forward for the defendant.  in the discussions with Officer

16   Lorick, and she may be the best person to elaborate on her

17   recommendation or what her suggestion would be, is that perhaps

18   time in a halfway house would be helpful here to attempt to

19   help the defendant get back on the right path in light of his

20   current mental health situation.

21             THE COURT:  What is the right path in terms of his

22   current mental health situation?  I know you are speaking in

23   generalities and you have to.  But you have to understand that

24   I am concerned that essentially what we did before is what you

25   are asking us to do again, and it didn't work the last time.

11

1          MS. POMERANTZ:  I understand the Court's concerns,

2     your Honor, and that is a concern I think the parties share

3     here today.

4          THE COURT:  Ms. Lorick, is it possible for you and

5     your office to put together some sort of plan in terms of where

6     Mr. Kinnucan could go, what programs would be available to him,

7     what the people who are treating him think would be an

8     appropriate period of time to try and give him the best chance

9     possible?  Also, to be quite honest, what are the prospects for

10    employment?  I know that he is not an unintelligent man.  I

11    know he has accomplished a lot of things.  But are we talking

12    to the Mr. Kinnucan that did all of those things or are we

13    talking to someone who is a passive shell?

14         MS. BROWN:  Right now, your Honor, the mental health

15    has to be the primary thing.  If he can't function on a basic

16    level, obviously, he is not employable.  Where he sits right

17    now, he doesn't look so good.  We are trying to get him to --

18    the hope is that mental illness is treatable.  It's not that

19    it's going to be the end of him.

20         I'm happy to see him, I'm sorry to see him like this,

21    but I have a real fear of someone who is severely depressed and

22    you haven't heard from them in a while, things could have been

23    scarier.  I'm glad that didn't happen.

24         But, obviously, the hope is that treatment is

25    effective.  As you recall, he is an intelligent person with

1   skills.  But where he is right now, he is not able to make use

2   of those skills.

3          THE COURT:  Ms. Lorick, how difficult would it be to

4   get Mr. Kinnucan into such a halfway house?

5          MS. LORICK:  Your Honor, if the Court were to order

6   halfway house placement, we can initiate that process this

7   afternoon and it would take a few days for them to give us a

8   day, but we can start working on that plan today.  The halfway

9   house placement is a relatively easy process to do.

10          In terms of referring him for treatment, that's also a

11  relatively easy process.  We have providers that we contract

12  with that could start him on an intensive outpatient track and

13  we could really get a solid assessment of where things stand,

14  and I think that that would afford the probation department and

15  the Court an opportunity to see if Mr. Kinnucan is indeed

16  prepared to engage.  And so we would have a clearer picture of

17  where we can go from here earlier than six months because we

18  can sort of get him in a place where we can sort of see if we

19  can engage him in mental health treatment.

20          If I could provide some context why the probation

21  department seems like it's spinning its wheels and we are

22  coming back to the Court with a plan that has already been --

23          THE COURT:  I did not mean to imply or suggest that

24  you are spinning your wheels.  I actually am really impressed

25  with your patience and your desire to continue to try to help

Mr. Kinnucan.  Please do not take anything that I have said as
a criticism of the probation department, and I always have
these interesting battles with Ms. Brown because she is such a
good advocate for her client.

           Please continue.

           MS. LORICK:  I think that what's important to me and
to the probation department is to see if we could foster some
level of stability, because eventually he is not going to have
the oversight of the Court or the probation department and
where is he going to go from there.  That is the reason why we
were open to exploring a plan that has been explored in the
past.

           THE COURT:  How much longer does he have on supervised
release?

           MS. POMERANTZ:  Your Honor, I believe that his
supervised release ends on June 15 of this year.

           MS. LORICK:  It was scheduled to end.  But because
when the Court issued the warrant, that obviously tolled his
supervised release.  So the Court has the ability to either
stick with that expiration date or sentence him to supervision.

           THE COURT:  This is April.  You're talking in June?

           MS. LORICK:  Yes.

           THE COURT:  I am not sticking with that date.  That is
not in any, way, shape or form going to help Mr. Kinnucan.
While it is still running, I am revoking the supervised

1   release.  Where we go from there will depend on what

2   Mr. Kinnucan, with the aid of the probation department and

3   Ms. Brown, can do.

4          How much time would be reasonable to have another

5   court appearance that would give this plan an opportunity, No.

6   1, to come together and, No. 2, have a reasonable period of

7   time with Mr. Kinnucan?

8          MS. BROWN:  Just procedurally, your Honor, I think in

9   order for him to get into the halfway house, he may need to be

10  sentenced to the halfway house as a condition of his

11  supervision.  Just revoking without imposing a new term with

12  conditions I don't think is going to get him into the halfway

13  house.

14          If the idea is that we want to see how he does with

15  the programs, gets referred, etc., I think he is going to have

16  to be sentenced.  If the Court wants some flexibility, what you

17  can do is sentence him to what I hope is a modest term of

18  incarceration, your Honor, followed by a term of supervision,

19  and a period of -- we have discussed with probation six months

20  in the halfway house and it's during that six-month period,

21  your Honor, that we will see how he's doing.  If he violates at

22  all, then he is coming back on another violation and you are

23  going to do what you are going to do.  But I don't know that we

24  can put the plan in place unless you sentence him, but the

25  probation department will correct me.

1      THE COURT:  I could give an order that he be assigned

2  or taken in, but, Ms. Brown, I am assuming that you are telling

3  me what's really the operative process here.

4      MS. BROWN:  It could be a condition of bail.

5      THE COURT:  I have no basis to sentence him at this

6  point.

7      MS. BROWN:  He has to be there under some authority,

8  either released on bail and sent there or on supervised release

9  and sent there.  He can't be moved from prison to the halfway

10  house unless he is under one of those things, bail or

11  supervision.  Those are your options.

12      MS. POMERANTZ:  Your Honor, may I have one moment to

13  speak with Ms. Brown.

14      THE COURT:  Please.

15      MS. BROWN:  No.  Ms. Pomerantz is pointing out that

16  Mr. Kinnucan has not pled guilty, obviously.  He is prepared to

17  plead guilty, your Honor.  There is no question in his mind or

18  anyone else's mind that he failed to report.  So maybe

19  procedurally we should do that because can you even revoke

20  supervision before he admits?

21      THE COURT:  Sure I can.

22      MS. BROWN:  You can revoke his release, right?  He is

23  prepared to admit.

24      THE COURT:  My problem is the two months left.

25      MS. BROWN:  Your Honor, he is prepared to admit the

1   violation today, which would stop the clock and free you up to

2   do whatever you want.  Not whatever you want.  Within the

3   bounds of the statute.

4           THE COURT:  You know me, Ms. Brown.  Be careful what

5   you say.

6           MS. POMERANTZ:  Your Honor, I do believe that the

7   defendant has not been arraigned on the specifications, if we

8   could also do that as well.

9           THE COURT:  And have him plead not guilty.

10          MS. BROWN:  Plead guilty, your Honor.  He is prepared

11  to admit the violation.

12          THE COURT:  Which one?

13          MS. BROWN:  There is only one, failure to report.

14          MS. LORICK:  We were discussing how to resolve it,

15  since Mr. Kinnucan is prepared to plead.  And if the Court were

16  inclined to proceed to sentencing, in order to make a clean

17  transition, if the Court were to impose a sentence and then as

18  a special condition of supervised release the halfway house

19  placement and the mental health and substance abuse treatment,

20  all of those things that follow him right to the facility and

21  be a smooth transition right to the halfway house.  Once

22  whatever term of incarceration your Honor imposed was complete,

23  he would go straight to the halfway house because the Bureau of

24  Prisons would already have that on the judgment as the special

25  condition.

1          THE COURT:  Mr. Kinnucan, you are before me on a

2    violation of your supervised release by the probation

3    department.  Is that your attorney, Ms. Brown, with you?

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  Are you prepared to plead to this

6    violation at this time?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Let me read the violation:  On or about

9    September 8, 2016, the defendant failed to report to the U.S.

10   Probation Officer as directed, condition 1, grade C violation.

11         Mr. Kinnucan, how do you plead to that, guilty or not

12   guilty?

13         THE DEFENDANT:  Guilty.

14         THE COURT:  Now, are you prepared to proceed to

15   sentencing at this point?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Is there anything you would like to say on

18   your behalf?

19         THE DEFENDANT:  No, your Honor.

20         THE COURT:  Ms. Brown, was there something?

21         MS. BROWN:  Ms. Pomerantz was asking me whether the

22   allocution was sufficient.  I think it's sufficient.

23         THE COURT:  What else would you like?

24         MS. POMERANTZ:  Your Honor, I didn't know if you

25   wanted to hear him say in his own words that he failed to

 1    report.

 2              THE COURT:  This is pretty straightforward.

 3              MS. POMERANTZ:  I understand, your Honor.

 4              THE COURT:  This is not a complicated RICO thing or

 5    something.  He either showed up when he was supposed to or he

 6    didn't.

 7              MS. POMERANTZ:  I understand, your Honor.

 8              THE COURT:  I am sorry, Mr. Kinnucan.  Did you want to

 9    say something on your own behalf before I sentence you?

10              THE DEFENDANT:  No, your Honor.

11              THE COURT:  Ms. Brown, would you like to say something

12    on Mr. Kinnucan's behalf before I sentence him?

13              MS. BROWN:  I would, your Honor.

14              I think that Officer Lorick's proposal is a sound one.

15    What she is suggesting is a sentence of two months in jail,

16    your Honor.  He has already served about three weeks.  That

17    would give her about five weeks to put all of the provisions in

18    place to set the halfway house up, to make the referrals, and

19    then a six-month period in the halfway house to follow as a

20    condition of supervision.  Your Honor could impose a new term

21    of one year of supervision, meaning when he is released to the

22    halfway house there would be another year to follow him.

23              That sentence, your Honor, of essentially two months

24    in jail plus six months in the halfway house is actually at the

25    high end of the guideline range, which is between three and

1   nine months, so it's certainly not ignoring or not putting on a

2   consequence for the grade C violation.  It is a consequence.

3   Obviously, he has been in custody through five different states

4   getting up here, he is going to have some more custody locally,

5   and then he is going to have six more months in a halfway

6   house, which is a custodial setting.  It's a correctional

7   setting.  It's rare that I'm recommending the exact same thing

8   as probation, but I'm recommending the exact same thing as

9   probation, your Honor.

10           THE COURT:  Ms. Brown, thank you.

11           Ms. Pomerantz, do you wish to be heard?

12           MS. POMERANTZ:  May I have a moment to speak with

13   probation?

14           THE COURT:  Certainly.  Because I am also going to

15   hear from Ms. Lorick.  But, please, go ahead.

16           MS. POMERANTZ:  Nothing from the government, your

17   Honor.

18           THE COURT:  Ms. Lorick, would you like to say

19   anything.

20           MS. LORICK:  Your Honor, the only thing that I would

21   like to add is that you could actually impose up to three

22   years' supervised release.  But I think that a year is

23   sufficient because we would know pretty soon whether or not

24   Mr. Kinnucan is on board with the plan that has been

25   established for him.

1   THE COURT:  Let me make sure I understand this before

2   I impose it.  A two-month period of imprisonment, a six-month

3   period as a condition of supervised release at a halfway house

4   with treatment, and then a year's supervised release to follow.

5   MS. BROWN:  The year, your Honor, starts when he

6   starts the halfway house.  The halfway house is a condition of

7   supervised release.

8   THE COURT:  That six months, that would only leave six

9   months left?

10   MS. BROWN:  After.  That's correct, your Honor.

11   THE COURT:  Can I give him a year and a half?

12   MS. BROWN:  You can, but I don't think you should, and

13   I don't think Officer Lorick does either.  I think she thinks

14   another six months after to see if he's back on his feet, but

15   I'll let her speak for herself.

16   MS. LORICK:  Your Honor, 12 months, 18 months.  I

17   think we will know within 30 to 60 days whether or not

18   Mr. Kinnucan is going to do it.  If he does not, we will be

19   before the Court again and those options will still be

20   available to you.

21   THE COURT:  I appreciate that.

22   MS. LORICK:  Can I just add one more thing.

23   THE COURT:  You can add as much as you need to or want

24   to.

25   MS. LORICK:  With the one-year supervised release, the

1    six months' halfway house placement will be a standalone

2    condition.  The mental health treatment and substance abuse

3    treatment would be separate special conditions.  We would have

4    the special condition of the halfway house and then the special

5    condition of substance abuse and mental health because we don't

6    want to cloud it and make it appear that the treatment is only

7    required while at the halfway house.

8              THE COURT:  Let me try and get through this.  If there

9    is any problem, you are all free to let me know.

10             Mr. Kinnucan, I am now about to impose a sentence upon

11   you for your guilty plea to specification 1, which is the only

12   specification against you.  You are sentenced to a term of

13   imprisonment of two months.  Upon completion of that term of

14   imprisonment you are sentenced to a term of supervised release

15   for one year, six months of which must be in a halfway house

16   and, in addition, the treatment is for that entire period of

17   time, so it will start in a halfway house and then when you are

18   out, you will have approximately six months more on supervised

19   release, which will be your opportunity to show that you can

20   get it together.  If you don't get it together, you will be

21   back here and I have to say that having tried everything else

22   twice now, that if you do come back here for a violation of

23   your supervised release, I am starting thinking about the

24   opportunity of a longer period of imprisonment.  And you don't

25   want that and I don't think that would be good for you.  But

1    it's in your hands to make sure that that doesn't happen.

2         The standard conditions of supervised release

3    continue.  As I said, the mental health treatment, the

4    substance abuse treatment, especially alcohol, but if there are

5    any others, those, too, are terms of your supervised release.

6    If you don't go, you will be violating your supervised release

7    and you'll be right back here.

8         Ms. Pomerantz, is there anything else we need to do in

9    this matter today?

10        MS. POMERANTZ:  I don't believe so, your Honor.

11        THE COURT:  Ms. Brown.

12        MS. BROWN:  No, your Honor.

13        MS. POMERANTZ:  Your Honor, Officer Lorick was just

14   pointing out to me that in the last judgment, under the special

15   conditions of supervision, it also provided one note regarding

16   forfeiture, and I believe that might have been a remnant from

17   the underlying case.  That was what Officer Lorick was pointing

18   out.

19        THE COURT:  So you want it out or you want it in?

20        MS. BROWN:  What is it exactly?

21        MS. LORICK:  It's in both of the judgments and I am

22   not sure it was ever satisfied.

23        MS. BROWN:  Your Honor, we have no objection to

24   maintaining the special condition 8 in the prior judgment

25   related to the forfeiture.

1          THE COURT:  I have special condition 6.

2          MS. LORICK:  In the original judgment it was special

3   condition 8 and in the violation judgment it's special

4   condition 6.

5          THE COURT:  Special condition 6, bringing in all of

6   the terms of the supervised release from the prior supervised

7   release violation, so that will remain.

8          MS. LORICK:  Thank you, your Honor.  That is it from

9   probation.

10          THE COURT:  Thank you very much.

11          Mr. Kinnucan, there are four people here very

12   concerned about your welfare, about your making your life what

13   it can be and what you probably would want it to be.  They are

14   working very hard.  But everything you are doing is not going

15   to make a difference unless you are participating just as

16   fervently as they are.  You understand?

17          THE DEFENDANT:  I do.

18          THE COURT:  This is not a chance or a time just to

19   sit.  This is a time to take an active part in helping yourself

20   by taking advantage of all of the services that can be made

21   available to you that Ms. Lorick will make available to you,

22   that Ms. Brown will make sure you get.  Take advantage of this.

23   All right?

24          THE DEFENDANT:  All right.

25          THE COURT:  This matter is adjourned.  (Adjourned)